1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DAVID FLORENCE,                           No.  2:11-cv-3119 GEB KJN P

12                    Plaintiff,

13            v.                                FINDINGS AND RECOMMENDATIONS

14   A.W. NANGALAMA, et al.,

15                    Defendants.

16

17   I.  Introduction

18          Plaintiff is a state prisoner, proceeding without counsel.  The instant action proceeds on

19   plaintiff's third amended complaint alleging Eighth Amendment violations and retaliation claims

20   against defendants A. Nangalama, C. Bakewell, K. Sarver, S. Baidar, A. Lopez, and E. Colter.

21   Defendants' motion for summary judgment is before the court.[1]  As set forth more fully below,

22   the undersigned finds that defendants' motion for summary judgment should be granted in part

23   and denied in part.

24   ////

25

26   _____

     [1]  On June 24, 2015, plaintiff's Rule 56(d) motion was granted in part.  (ECF No. 84.)  Plaintiff

27   was provided an opportunity to file either a revised opposition or a notice confirming his choice
     to stand on the May 12, 2015 opposition, and defendants' reply was due 14 days thereafter.  On

28   July 27, 2015, plaintiff filed a response that he chose to stand on his prior opposition.  (ECF No.
     85.)  Defendants did not file a reply.

                                                    1

II. Plaintiff's Third Amended Complaint

On November 7, 2012, plaintiff filed a 41 page, unverified third amended complaint, and appended over 300 exhibits.  (ECF No. 17.)  Pursuant to the April 3, 2013 screening order, as well as resolution of a motion to dismiss, this case proceeds solely[2] on the following claims:  (ECF Nos. 19; 46; 52.)

Second Claim:  Plaintiff asserts that defendant Nangalama retaliated against him for exercising his First Amendment rights on August 12, 2009, specifically stating that:

> plaintiff was called to B Clinic about Appeal SAC-10-09-11646 regarding defendants S. Hermann, K. Sarver, C. Bakewell and A. Nangalama being deliberately indifference to his serious medical needs, during the appeal review defendant's C. Bakewell, A. Nangalama, and D. [McDowell] stated to plaintiff that if he withdrawal his appeal, they would give him the Methadone back in pill form, when plaintiff refused, defendant C. Bakewell got mad and started hollering at plaintiff to get the hell out[.]  [D]efendant A. Nangalama refused to give plaintiff anything for the pain in his stomach.

(ECF No. 17 at 18-19.)

Third Claim:  Plaintiff asserts that Nangalama was deliberately indifferent to his serious medical needs on several occasions, including an allegation that Nangalama took no corrective action after plaintiff informed him that the liquid Methadone that he was taking was causing him to throw up blood at times.

Fourth Claim:  Plaintiff states in part that:

> [O]n August 12, 2009, plaintiff was called to B-Clinic about Appeal SAC-10-09-11646 regarding defendants C. Bakewell, S. Hermann,

---

[2]  In his opposition, plaintiff claims, for the first time, that defendants Nangalama and Bakewell allowed plaintiff's pain medications, Methadone and Neurontin, to intentionally expire on November 26, 2008, and did not renew them until December 9, 2009, and February 27, 2009. ECF No 82 at 12;14.)  However, such claims were not included in plaintiff's pleading.  (ECF No. 17, *passim*.)  Plaintiff is advised that an opposition to a motion for summary judgment is not a proper vehicle for adding new claims to his complaint.  See Wasco Products, Inc. v. Southwall Technologies, Inc., 435 F.3d 989, 992 (9th Cir. 2006) ("[T]he necessary factual averments are required with respect to each material element of the underlying legal theory . . . . Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings."); Brass v. County of Los Angeles, 328 F.3d 1192, 1197-98 (9th Cir. 2003) (upholding the district court's finding plaintiff had waived § 1983 arguments raised for first time in summary judgment motion where nothing in amended complaint suggested those arguments, and plaintiff offered no excuse or justification for failure to raise them earlier).  Thus, the court does not address such newly-added claims.

1
2
3
4
5

> K. Sarver, and A. Nangalama being deliberate indifferent to his serious medical need, during the appeal review defendants C. Bakewell, A. Nangalama, and D. [McDowell] stated to plaintiff if he withdrawal his appeal they would give him the Methadone back in pill form when plaintiff refused defendant C. Bakewell got mad and started hollering at plaintiff to get the hell out and for defendant A. Nangalama when plaintiff asked defendant A. Nangalama for something for his stomach she walked up to plaintiff face and said get out.

6  (ECF No. 17 at 24.)  The court initially described this claim as "plaintiff alleged an adverse action

7  (the refusal of medication), because of plaintiff's failure to withdraw his grievance on appeal

8  which chilled the inmate's exercise of his First Amendment rights, without a legitimate

9  penological goal or interest."  (ECF No. 18 at 6.)

10      <u>Fifth Claim:</u>  Plaintiff alleges that defendant Bakewell was deliberately indifferent to his

11  serious medical needs, in part because on July 10, 2009, plaintiff told Bakewell that he was

12  throwing up blood and had severe headaches due to the liquid Methadone.  Plaintiff then asked if

13  he could see defendant Nangalama who was a medical professional.  However, plaintiff asserts

14  that Bakewell told him that neither she nor defendant Nangalama were going to see him.

15      <u>Seventh Claim:</u>  Plaintiff alleges a retaliation claim against defendant K. Sarver, as

16  follows:

17
18
19
20
21

> First Incident.  On July 10, 2009 Plaintiff was called to B. Clinic to see the R.N. about the adverse effect of the liquid Methadone and seen defendant A. Nangalama and explained to him that the liquid Methadone was causing him to throw up, throw up blood at times he sta[t]ed to sit down on the bench and he would see Plaintiff. Plaintiff repeated this to defendant K. Sarver defendant K. Sarver stated to Plaintiff that defendant A. Nangalama was not seeing him and went to get defendant S. Hermann and prevented plaintiff from seeing A. Nangalama.

22
23
24
25
26

> Second Incident.  On February 28, 2011 Plaintiff was call[ed] to see defendant A. Nangalama about not getting the medication he ordered for Plaintiff on 1-27-11 defendant A. Nangalama asked Plaintiff to pull his pants down so he could see his genitals defendant K. Sarver went to get defendant E. Colter and told him to go to defendant A. Nangalama office and listen to what the Plaintiff and defendant A. Nangalama was saying because the Plaintiff was suing the both of them and always writing them up. [D]efendant E. Colter came into the room and started listening.

27
28

> Third Incident.  On February 28, 2011 defendant K. Sarver stated Plaintiff refused a urine test in violation of his First Amendment rights and that defendant chilled the effect of Plaintiff ex[e]rcise of

3

1
2

his First Amendment rights through actions that did not advance
any legitimate penological goals nor tailored narrowly enough to.

3

(ECF No. 17 at 29-30.)  Essentially, plaintiff alleges that defendant Sarver prevented him from

4

seeing Dr. Nangalama even though plaintiff had a serious medical need.  Later, plaintiff asserts

5

that this adverse action was done in retaliation for plaintiff exercising his First Amendment rights

6

which had a chilling effect on those rights.

7

Eighth Claim:  Plaintiff also asserts that defendant K. Sarver was deliberately indifferent

8

to plaintiff's serious medical needs.  Plaintiff alleges a serious medical need when he went to see

9

A. Nangalama because the liquid Methadone was making him throw up.  His only allegation

10

against Sarver within this claim is that Sarver told him that Nangalama was not going to see him.

11

Plaintiff appear to allege that Sarver acted to prevent or deny plaintiff medical care for his serious

12

medical needs.

13

Eleventh Claim:  Plaintiff alleges that defendant S. Baidar retaliated against plaintiff, as

14

follows:

15
16
17
18
19
20
21
22
23

First Incident, on February 14, 2011 Plaintiff went to see defendant
S. Baidar about not getting the medication that defendant A.
Nangalama ordered on 1-27-11 defendant S. Baidar called the
pharmacy and was told they sent the full amount when plaintiff
asked him for the name of the person that he spoke with because he
was filing an appeal defendant S. Baidar got mad and went to
defendant A. Nangalama office and told him to take plaintiff off his
pain medication since he was feeling pain in the genitals and
wanted to file appeals against them and stated he was putting
plaintiff on the doctors line in 14 days and defendant A. Nangalama
agreed despite that fact that plaintiff had an infection in his genital
in violation of his First Amendment rights and that defendant
chilled the effect of plaintiff exercise of his First Amendment
rights, through actions that did not advance any legitimate
penological goals nor are tailored narrowly enough to achieve such
goals.

24

(ECF No. 17 at 34-35.)

25

Thirteenth Claim:[3]  Plaintiff claims that in response to plaintiff filing appeals against

26

defendant Dr. Nangalama, and in response to plaintiff threatening to write up defendant Lopez,

27
28

---

[3]  The amended complaint lists this claim as plaintiff's fourteenth claim, and his fourteenth claim
as his thirteenth claim.

4

1   defendant Lopez retaliated against plaintiff by telling other inmates that it was plaintiff's fault

2   that access to the medication cart was limited to one inmate, and by calling plaintiff a "snitch ass"

3   in front of other inmates, which allegedly put plaintiff's life at risk of harm from other inmates,

4   and chilled his exercise of his First Amendment rights.  (ECF No. 46 at 15.)

5        Fourteenth Claim:  Plaintiff alleges that defendant Colter called him a snitch around other

6   inmates because plaintiff was exercising his First Amendment rights which chilled his First

7   Amendment rights.

8   III.  Legal Standard for Summary Judgment

9        Summary judgment is appropriate when it is demonstrated that the standard set forth in

10   Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

11   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

12   judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]the moving party always bears the

13   initial responsibility of informing the district court of the basis for its motion, and identifying

14   those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

15   together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue

16   of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered

17   Fed. R. Civ. P. 56(c)).  "Where the nonmoving party bears the burden of proof at trial, the moving

18   party need only prove that there is an absence of evidence to support the non-moving party's

19   case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.),

20   627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P.

21   56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have

22   the trial burden of production may rely on a showing that a party who does have the trial burden

23   cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary

24   judgment should be entered, after adequate time for discovery and upon motion, against a party

25   who fails to make a showing sufficient to establish the existence of an element essential to that

26   party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477

27   U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving

28   party's case necessarily renders all other facts immaterial."  Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

1    Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

2    demonstrate a genuine issue, the opposing party "must do more than simply show that there is

3    some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

4    not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

5    trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

6          By contemporaneous notice provided on March 20, 2015 (ECF No. 73-3), plaintiff was

7    advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal

8    Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc);

9    Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

10   IV.  Facts[4]

11         1.  At all times relevant herein, plaintiff was in the custody of the California Department

12   of Corrections and Rehabilitation ("CDCR"), housed at the California State Prison, Sacramento

13   ("CSP-SAC").

14         2.  Defendant Dr. Nangalama is a medical doctor employed at CSP-SAC.

15         3.  Dr. Nangalama provided plaintiff excellent and continual medical care from 2009 to

16   2011.  (ECF No. 82 at 3.)

17         4.  Defendant Bakewell is a Nurse Practitioner formerly employed at CSP-SAC from

18   December 5, 2005, to September 25, 2009, and is presently retired from CDCR.

19         5.  On July 3, 2009, plaintiff was diagnosed with chronic neck and back pain.  (ECF No.

20   73-5 at 9.)  Dr. Nangalama changed plaintiff's Methadone prescription from tablet form to liquid

21   form.  (ECF No. 73-5 at 9.)

22         6.  On July 8, 2009, plaintiff submitted a request for health care services claiming the

23   liquid Methadone was making him sick.  (ECF No. 73-5 at 12.)

24         7.  On July 9, 2009, staff reviewed the July 8, 2009 request form, and plaintiff was

25   scheduled to see the nurse on July 10, 2009.  (ECF Nos. 17 at 6, 71; 73-5 at 12.)

26   _____

27   [4]  For purposes of the pending motion, the following facts are found undisputed, unless otherwise
     indicated.  Documents submitted as exhibits are considered to the extent that they are relevant,
28   and despite the fact that they are not authenticated because such documents could be admissible at
     trial if authenticated.

8. On July 10, 2009, plaintiff was examined by RN Goodman.  (ECF No. 73-5 at 12.)  The nurse noted that plaintiff wanted to see the doctor about liquid Methadone -- "it's making me sick."  (Id.)

9. The nurse "determines whether the inmate illness requires emergency treatment or whether it can be treated at a later time and date."  (ECF No. 82 at 44.)

10. On July 22, 2009, plaintiff saw a neurosurgeon at U.C. Davis Hospital.  (ECF No. 73-5 at 13.)

11. On July 27, 2009, plaintiff was seen by Dr. Nangalama for a follow-up.  (ECF No. 73-5 at 14.)  Dr. Nangalama noted that plaintiff was stable, and that he was in no acute distress and had no acute changes.  (Id.)  Plaintiff wanted Methadone tablets, not liquid.  (Id.)  Dr. Nangalama diagnosed plaintiff with Chronic Pain Syndrome.  Plaintiff stated that he was "not tolerating liquid Methadone and wants pills."  (Id.)  Dr. Nangalama added a prescription of 500 mg of Naproxen (ECF No. 73-5 at 3, 14, 16), and requested a follow-up with the pain clinic (ECF No. 73-5 at 14).  He ordered a return to medical clinic in 60 days.  (ECF No. 73-5 at 15.)

12. On August 12, 2009, plaintiff was called to medical for an appeals review.  (ECF No. 17 at 74.)

13. On August 13, 2009, plaintiff was provided notice that he was scheduled for epidural steroid injections for chronic pain in the next two weeks.  (ECF No. 73-5 at 19.)

14. On August 16, 2009, plaintiff submitted a health care services request form stating that he needed to see the doctor concerning his Methadone prescription, claiming he was still in pain after taking it, and "concerning [his] stomach."  (ECF No. 73-5 at 21.)  Plaintiff stated that he put in a slip on July 31, 2009, and still hadn't seen the doctor.  (Id.)  The August 16 form was received on August 17, 2009, but was completed by RN Edmondson on August 18, 2009.  Nurse Edmondson noted that plaintiff claimed he "can't eat liquid methadone is making him sick."  (Id.)[5]

////

---

[5]  There is no treatment noted on the form dated August 16, 2009; rather, the box "See Nursing Encounter Form" is marked.  (Id.)  Such attachment was not provided to the court.

15. On August 24, 2009, plaintiff was seen for his pain medications. (ECF No. 73-5 at 24.) The doctor wrote that plaintiff has chronic lower back pain and neck pain, and his medications were reflected as: Methadone, 10 mg, Neurontin, 1200 mg, and Naproxen, 500 mg. (ECF No. 73-5 at 24.) The doctor noted that plaintiff "stated that he gets nauseated with liquid Methadone." (Id.) The doctor added that plaintiff was seen by UCD Neurology on July 22, 2009, but did not recommend surgery." (Id.) The doctor further noted that there were no acute changes, that plaintiff should continue current pain prescriptions, and plaintiff has been referred to the pain clinic. (Id.)

16. On September 18, 2009, plaintiff's Methadone prescription was returned to pill form. (ECF No. 73-5 at 28.)

17. On June 18, 2010, a lipid profile was run on plaintiff. (ECF No. 82 at 128.) The cholesterol results reflect an HDL level of 44, his cholesterol/HDL ratio was 4.8, and states that plaintiff's cardiac risk factor was "average risk" based on his LDL/HDL ratio of 3.25. (Id.)

18. On September 7, 2010, plaintiff presented with complaints that he had pain in his testes for over three weeks; the doctor diagnosed "rule out Epididymitis," and prescribed Cipro. (ECF No. 82 at 161.)

19. Dr. Nangalama examined plaintiff on October 6, 2010. (ECF No. 73-5 at 5.)

20. On October 25, 2010, plaintiff complained of chest pain, and was evaluated and treated at the prison, including receiving nitroglycerin, and was then transferred by ambulance to the San Joaquin General Hospital Emergency Department. His October 25, 2010 ECG was normal. (ECF No. 73-5 at 60.) The progress notes state that his discharge diagnosis was "noncardiac chest pain." (ECF No. 73-5 at 74.)

21. Plaintiff received a scrotal ultrasound on November 10, 2010, with the following conclusion:

> 1. . . . benign, . . . right epididymal cyst.
>
> 2.   Slight enlarged left epididymal head without abnormal vascularity.   These findings suggest probably chronic left epididymitis. Clinical correlation is recommended.
>
> 3. Small, bilateral hydroceles.

9

1        4.  No testicular mass or torsion.

2    (ECF No. 82 at 157.)

3        22.  The medication reconciliation form reflects that plaintiff was prescribed Gabapentin

4    for neuropathy on November 4, 2010, with an expiration date of February 2, 2011.  (ECF No. 73-

5    5 at 83.)

6        23.  Plaintiff was prescribed Simvastatin[6] on November 8, 2010, with an expiration date of

7    February 8, 2011.  (ECF No. 73-5 at 87 (medication reconciliation).)

8        24.  On December 1, 2010, plaintiff was prescribed Methadone, 10 mg tablets, with an

9    expiration date of March 1, 2011.  (ECF No. 73-5 at 83 (medication reconciliation).)

10       25.  Defendant Sarver is a nurse employed at CSP-SAC.

11       26.  Defendant Baidar is a Registered Nurse employed at CSP-SAC since 2004.[7]

12       27.  On January 24, 2011, plaintiff submitted a Health Care Services Request Form in

13   which he complained that he was not receiving the antibiotics he was prescribed by Dr.

14   Nangalama.  (ECF Nos. 73-5 at 82; 82 at 31.)  As a result of this request, plaintiff was

15   interviewed and examined in the medical clinic by defendant Baidar on January 27, 2011.[8]  (ECF

16   No. 73-5 at 82.)

17       28.  During the exam, defendant Baidar noted that plaintiff complained of genital pain and

18   his thyroid condition.  Plaintiff claimed that he needed to have his prescription for Levothyroxine

19   renewed, and that he was not getting his prescribed Sulfamethoxazole.  Defendant Baidar checked

20   plaintiff's medical records and verified that Dr. Nangalama renewed plaintiff's Levothyroxine

---

21   [6]  Simvastatin is a "statin" drug used to reduce the risk of heart attack and stroke, as well as to
22   reduce the bad cholesterol and triglycerides in the blood, while increasing levels of good
     cholesterol.  U.S. National Library of Medicine, MedlinePlus, "Simvastatin,"
23   https://www.nlm.nih.gov/medlineplus/druginfo/meds/a692030.html, accessed February 24, 2016.

24   [7]  Plaintiff did not dispute facts 27-29 concerning defendant Baidar.  (ECF No. 82 at 3.)

25   [8]  The January 27, 2011 form appears to be signed by an RN named "Sayed."  (ECF No. 73-4 at
26   6.)  In light of defendant Baidar's declaration appending the form and stating that Baidar
     examined plaintiff on January 27, 2011, it appears that Baidar and Sayed may be the same person.
27   See also appeal HC-11-13677, where plaintiff claimed he was called in to see RN Sayed on
     February 14, 2011, and the names of Sayed and Baidar are both referenced in connection with the
28   January 27, 2011 visit.  (ECF No. 17-2 at 44, 48, 50-55.)

prescription on January 3, 2011, and verified that plaintiff was prescribed Sulfamethoxazole. Defendant Baidar called the prison pharmacy to inquire as to whether plaintiff was receiving these medications, and the pharmacist confirmed that the prescription was valid, and that the medications would be delivered to plaintiff the same day.  Defendant Baidar then noted that because it was a routine medical visit, plaintiff should return to the medical clinic for a follow-up between one and fourteen days later.  The time period an inmate waits for a follow-up visit is typically referred to as waiting in the "doctor's line."

29.  Further, defendant Baidar waived plaintiff's fee for the visit.  Inmates are normally charged a $5.00 co-pay for routine medical visits.  These co-pays are deducted from their inmate trust accounts.  But defendant Baidar exempted plaintiff from this charge for the January 27, 2011 visit.

30.  The medication reconciliation form dated January 27, 2011, shows that plaintiff was prescribed Sulfamethoxazole, which would expire on February 27, 2011.  (ECF No. 73-5 at 83.)

31.  On January 31, 2011, Dr. Nangalama renewed plaintiff's prescription to Gabapentin. (ECF No. 83, 86.)

32.  Plaintiff's ears began ringing in January of 2011.  (ECF No. 17-2 at 35, 36.)

33.  On February 2, 2011, plaintiff was examined by Dr. Nangalama for a chronic care follow-up visit.  (ECF No. 73-5 at 84.)  The doctor noted plaintiff had recent epididymitis, and that plaintiff's labs were normal.  (Id.)  Dr. Nangalama renewed plaintiff's 10 mg Methadone prescription, noting "severe cervical radiculopathy."  (ECF No. 73-5 at 86.)  The doctor also renewed plaintiff's Simvastatin prescription, which would expire on May 3, 2011.  (ECF No. 73-5 at 87, 91.)

34.  On February 9, 2011, plaintiff completed a health care services request form, stating that he was in pain, his genitals were hurting, and his ears had been ringing for over a month. (ECF No. 82 at 165.)  Plaintiff complained that he has more pain, and that the Methadone and Gabapentin were not helping for the genital pain, only the back pain.  (Id.)

35.  On February 28, 2011, Dr. Nangalama saw plaintiff, and defendant Sarver called defendant Colter into the exam room.  The doctor prescribed Bactrim DS.  (ECF No. 73-5 at 88.)

11

36.  On February 28, 2011, plaintiff told defendant Dr. Nangalama that he could not wait to provide a urine sample because he "needed to go back to his cell and finish typing up his legal papers, because they had to be sent out that night."  (ECF No. 82 at 69.)

37.  On February 28, 2011, Dr. Nangalama signed a CDC 7225 Refusal of Examination and/or Treatment; defendant Sarver signed the form as a witness.  (ECF No. 73-5 at 89.)

38.  Dr. Nangalama referred plaintiff to an Ear, Nose & Throat specialist on May 5, 2011, based on a diagnosis of tinnitus in both ears.  (ECF No. 82 at 95.)

39.  Dr. Nangalama referred plaintiff to a urologist on May 5, 2011, based on chronic testicular pain, and Dr. Nangalama noted that plaintiff had been on two rounds of antibiotics. (ECF No. 82 at 94.)

40.  On June 29, 2011, plaintiff had a telemedicine consultation with an outside doctor, James Fawcett, M.D.  (ECF No. 82 at 107.)  Dr. Fawcett noted that plaintiff's 2010 scrotal ultrasound was "essentially normal," and plaintiff's lab test results were normal.  (Id.)  Dr. Fawcett's impression was "probable interstitial cystitis."  (ECF No. 82 at 108.)  The doctor explained to plaintiff the theory of mucosal permeability disorder, which the doctor thought explained the "constellation of urinary symptoms and pain that [plaintiff] has experienced," but likely were "inherent problems."  (Id.)  "These are not documentable, so further investigations, such as urine or blood testing, cystoscopy, and biopsies, are fruitless."  (Id.)  Dr. Fawcett noted that plaintiff's conditions are benign, and prescribed plaintiff Elmiron 200 mg.  (Id.)

41.  Defendant Colter is a retired Correctional Officer formerly employed at CSP-SAC as a Medical Escort Officer.

42.  Defendant Lopez is a Correctional Officer employed at CSP-SAC in early 2011. (ECF No. 17-3 at 8.)

43.  On March 23, 2011, defendant Lopez escorted plaintiff to medical; when they arrived at the sallyport gate, defendant Colter was at the gate.

44.  On March 24, 2011, and March 28, 2011, defendants Lopez and Colter were involved in the distribution of medication in plaintiff's housing unit.

////

1    V.  42 U.S.C. § 1983

2           Section 1983 provides a cause of action against any person who, under color of state law,

3    "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any

4    rights, privileges, or immunities secured by the Constitution."  42 U.S.C. § 1983.  "A person

5    'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983,

6    if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act

7    which he is legally required to do that causes the deprivation of which complaint is made."

8    Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).  "In a § 1983 action, the plaintiff must also

9    demonstrate that the defendant's conduct was the actionable cause of the claimed injury.  To meet

10   this causation requirement, the plaintiff must establish both causation-in-fact and proximate

11   causation."  Harper v. City of L.A., 533 F.3d 1010, 1026 (9th Cir. 2008) (internal citations

12   omitted).  Proximate cause requires "'some direct relation between the injury asserted and the

13   injurious conduct alleged.'"  Hemi Group, LLC v. City of New York, 559 U.S. 1, 130 S. Ct. 983,

14   989, 991 (2010) (quoting Holmes v. Secs. Investor Prot. Corp., 503 U.S. 258, 268 (1992)).

15   VI.  Eighth Amendment Claims

16          A.  Legal Standards

17          The Eighth Amendment protects prisoners from inhumane conditions of confinement.

18   Farmer v. Brennan, 511 U.S. 825, 832 (1994).  To prevail on an Eighth Amendment claim for

19   deliberate indifference arising out of inadequate medical care, a plaintiff must show "deliberate

20   indifference" to his "serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "This

21   includes 'both an objective standard -- that the deprivation was serious enough to constitute cruel

22   and unusual punishment -- and a subjective standard -- deliberate indifference.'"  Colwell v.

23   Bannister, 763 F.3d 1060, 1066 (9th Cir. 2014) (citation omitted).

24          To meet the objective element of the standard, a plaintiff must demonstrate the existence

25   of a serious medical need.  Estelle, 429 U.S. at 104.  Such a need exists if failure to treat the

26   injury or condition "could result in further significant injury" or cause "the unnecessary and

27   wanton infliction of pain."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting

28   McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled in part on other grounds by

1  WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc)) (internal quotation marks

2  omitted).  A serious medical need exists if the failure to treat a prisoner's condition could result in

3  further significant injury or the unnecessary and wanton infliction of pain, including "[t]he

4  existence of an injury that a reasonable doctor or patient would find important and worthy of

5  comment or treatment; the presence of a medical condition that significantly affects an

6  individual's daily activities; or the existence of chronic and substantial pain." McGuckin, 974

7  F.2d at 1059-60.

8          To satisfy the subjective element of deliberate indifference, the plaintiff must show that

9  "the official knows of and disregards an excessive risk to inmate health or safety; the official

10  must both be aware of facts from which the inference could be drawn that a substantial risk of

11  serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.  A plaintiff

12  must establish that the course of treatment the doctors chose was "medically unacceptable under

13  the circumstances" and that they embarked on this course in "conscious disregard of an excessive

14  risk to plaintiff's health." Toguchi v. Chung, 391 F.3d 1051, 1058-60 (9th Cir. 2004) (internal

15  citations and quotations omitted).  Indifference may appear "when prison officials deny, delay or

16  intentionally interfere with medical treatment, or it may be shown by the way in which prison

17  physicians provide medical care." Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988)

18  (citing Estelle, 429 U.S. at 106).

19          "[A] mere difference of medical opinion . . . [is] insufficient, as a matter of law, to

20  establish deliberate indifference." Toguchi, 391 F.3d at 1058 (internal quotes and citation

21  omitted); see also Brown v. Beard, 445 F. App'x. 453, 455 (3rd Cir. 2011) ("A professional

22  disagreement between doctors as to the best course of treatment does not establish an Eighth

23  Amendment violation.").  "Simply showing that another doctor in similar circumstances might

24  have ordered different treatment," however, "only raises questions about medical judgment and

25  does not show that the physician acted with a culpable mind greater than negligence." Starbeck

26  v. Linn County Jail, 871 F.Supp. 1129, 1144 (N.D. Iowa Dec. 12, 1994) (citing Noll v. Petrovsky,

27  828 F.2d 461, 462 (8th Cir. 1987)).  Instead, the plaintiff must not only show that a physician's

28  course of treatment "was medically unacceptable under the circumstances," but that the physician

14

1   chose it "in conscious disregard of an excessive risk to [the] plaintiff's health."  Jackson v.

2   McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); see also Johnson v. Doughty, 433 F.3d 1001, 1013

3   (7th Cir. 2006) ("It is not enough to show, for instance, that a doctor should have known that

4   surgery was necessary; rather, the doctor must know that surgery was necessary and then

5   consciously disregard that need in order to be held deliberately indifferent.").

6       B.  Discussion

7       In his third claim, plaintiff alleges that Dr. Nangalama was deliberately indifferent to

8   plaintiff's serious medical needs based on several incidents.  The court will first address the July

9   10, 2009 incident, which also encompasses plaintiff's separate claims as to defendants Bakewell

10  (fifth claim) and Sarver (eighth claim).  The court will then turn to the remaining incidents.

11      1.  July 10, 2009 incident (Dr. Nangalama, Bakewell & Sarver)

12       Plaintiff asserts that on July 10, 2009, Dr. Nangalama was deliberately indifferent to

13  plaintiff's serious medical needs because the doctor took no corrective action after plaintiff

14  informed him that the liquid Methadone was causing him to throw up, and to throw up blood at

15  times.  Also, plaintiff claims that despite Dr. Nangalama telling plaintiff the doctor would see

16  him, Dr. Nangalama refused to see plaintiff on July 10, 2009.

17      In his fifth claim, plaintiff alleges that he told defendant Bakewell that he was throwing up

18  blood and had severe headaches due to the liquid Methadone.  Plaintiff then asked if he could see

19  defendant Nangalama who was a medical professional.  However, plaintiff asserts that Bakewell

20  told him that neither she nor defendant Nangalama were going to see him.  In the eighth claim,

21  plaintiff alleges a serious medical need when he went to see A. Nangalama because the liquid

22  Methadone was making him throw up, but his only allegation against defendant Sarver is that on

23  July 10, 2009, Sarver told him that Dr. Nangalama was not going to see him.  Plaintiff appears to

24  allege that Sarver acted to prevent or deny plaintiff medical care for his serious medical needs.

25      The undisputed facts reflect that plaintiff suffers from chronic pain, which constitutes a

26  serious medical need, and that plaintiff was prescribed 10 mg of Methadone for pain.

27      The parties dispute what transpired when plaintiff presented for his nurse's appointment

28  on July 10, 2009.  Plaintiff claims that when he "happened to see" the doctor, he told Dr.

15

1   Nangalama that the liquid Methadone was causing plaintiff to become nauseated, throw up, throw

2   up blood at times, and have headaches.  (ECF No. 82 at 46, 75 at 11.)  Dr. Nangalama does not

3   recall having any interaction with plaintiff on July 10, 2009, and there is no medical record to

4   show that the doctor saw plaintiff on that date.  (ECF No. 82 at 99.)

5        However, it is undisputed that plaintiff had an appointment with the nurse on July 10,

6   2009, not the doctor, and that the nurse "determines whether the inmate illness requires

7   emergency treatment or whether it can be treated at a later time and date."  (ECF No. 82 at 44.)  It

8   is also undisputed that plaintiff was examined by RN Goodman on July 10, 2009, although

9   plaintiff disputes Goodman's notes on the medical record, and believes he should have seen the

10   doctor.  Thus, plaintiff's dispute as to the treatment he received on July 10, 2009, amounts to a

11   difference of opinion.  Plaintiff believes he should have been seen by a doctor; RN Goodman

12   determined that plaintiff could be seen at a later time.  Indeed, once plaintiff was subsequently

13   seen by Dr. Nangalama on July 27, 2009, the doctor did not change plaintiff's Methadone

14   prescription from liquid form to tablet form.

15        Plaintiff states that when he was called to B-yard clinic to see the registered nurse, he

16   "happened to see" Dr. Nangalama.  (ECF Nos. 17 at 6; 82 at 46.)  Because plaintiff was not

17   scheduled to see Dr. Nangalama for a medical appointment on July 10, 2009, and Dr. Nangalama

18   did not examine plaintiff on July 10, 2009, the doctor could not be deliberately indifferent to

19   plaintiff's medical needs on that date.  Just as nonprisoners are required to follow procedures for

20   scheduling medical appointments, plaintiff is required to follow procedures to obtain medical

21   care.  Absent exigent circumstances not present here, patients are not permitted to flag doctors

22   down and expect to receive medical care on demand.  Indeed, both plaintiff and his witness,

23   inmate Monia, state that Nurse Kim told Dr. Nangalama that they were doing the doctor line.

24   (ECF No. 17-5 at 11.)  This means that other inmates were scheduled to see the doctor.

25        But even if Dr. Nangalama should have seen plaintiff based on plaintiff informing the

26   doctor in passing about plaintiff's symptoms, the doctor's failure to see plaintiff on this one date

27   at most constitutes negligence, not deliberate indifference, particularly given the circumstances.

28   ////

1    However, the issue of Dr. Nangalama changing plaintiff's Methadone prescription from

2    pill to liquid form on July 3, 2009, and then refusing to change the prescription back until

3    September 18, 2009, a period of two months and fifteen days, despite knowing that plaintiff was

4    not tolerating the liquid form of the medication, poses a different question.

5    Dr. Nangalama declares that he was aware of no medical reason why plaintiff should react

6    any differently to liquid Methadone, particularly where the dosage is the same.

7    Plaintiff provides his own declaration, and the declaration of inmate Monia, who declare

8    that on July 10, 2009, Dr. Nangalama told plaintiff that the doctor was "aware that the liquid

9    Methadone was causing people to throw up."  (ECF No. 17-5 at 10; 82 at 46.)  On July 27, 2009,

10   plaintiff further declares that he informed Dr. Nangalama that the neurosurgeon was familiar with

11   liquid Methadone, that a lot of people complain about it, and that it is synthetic.[9]  (ECF No. 82 at

12   52.)  Plaintiff declares that Dr. Nangalama then offered to increase the dose of Methadone, but

13   claimed the doctor was unable to return the prescription to pill form due to the Chief Medical

14   Officer's order.  (ECF No. 82 at 52.)  Such verified allegations raise an inference that Dr.

15   Nangalama was aware that plaintiff was having difficulty with the liquid Methadone prescription.

16   In addition, plaintiff provided the declaration of inmate Watts, who avers that he initially

17   received Methadone in pill form, but in July of 2009 was prescribed liquid Methadone.  (ECF No.

18   82 at 158.)  Inmate Watts declares that he told Dr. Nangalama that the liquid Methadone was

19   nauseating, burning his throat, and causing Watts to throw up, but that Dr. Nangalama refused to

20   take any corrective action and continued to force Watts to take the liquid Methadone.  (Id.)

21   Inmate Watts filed an appeal requesting Methadone in pill form, and "after a month the appeal

22   was granted and the Methadone was returned back to pill form."  (Id.)  This evidence supports

23   plaintiff's claim that Dr. Nangalama was aware that liquid Methadone could cause inmates

24   difficulties.

25   The record reflects that plaintiff complained of the harmful effects of the liquid

26   Methadone on several occasions, including throwing up, sometimes throwing up blood, and an

27

28   _____
     [9]  Plaintiff did not provide a declaration from the neurosurgeon.

1  inability to eat due to its effects.  On July 27, 2009, Dr. Nangalama noted in progress notes that

2  plaintiff was not tolerating the liquid Methadone.  (ECF No. 73-5 at 14.)  On August 24, 2009,

3  Dr. Nangalama noted that plaintiff reported that he "gets nauseated with liquid Methadone."

4  (ECF No. 73-5 at 24.)  It is undisputed that the dosage remained the same.

5       Here, plaintiff submitted no medical evidence rebutting Dr. Nangalama's medical opinion.

6  Plaintiff's lay opinion, and that of his inmate witnesses, as to the cause of plaintiff's symptoms

7  are speculative.  Plaintiff failed to demonstrate, through medical evidence, that there was a

8  medical reason Dr. Nangalama should not have prescribed liquid Methadone to plaintiff, or that

9  liquid form Methadone causes symptoms different from tablet form Methadone.[10]  Plaintiff

10  adduced no expert evidence advising doctors to prescribe Methadone in tablet form rather than

11  liquid form.  In addition, on the occasions plaintiff presented for medical care with Dr.

12  Nangalama, plaintiff was not vomiting or experiencing the symptoms he claimed to have upon

13  taking the liquid Methadone, and despite the two month and 15 day period, plaintiff did not

14  present with emergent or acute symptoms requiring urgent medical care attributable to the form

15  of the Methadone prescribed.  Plaintiff provided no evidence from a physician or other medical

16  expert attributing plaintiff's symptoms to the form of Methadone taken.

17       Thus, it appears that the form of medication provided, as well as the delay in obtaining the

18  return to tablet form Methadone, constitutes a mere difference of opinion as to the medical care

19  provided by Dr. Nangalama.  But even assuming, *arguendo*, Dr. Nangalama should have changed

20  the form of the Methadone prescription earlier than he did, plaintiff adduces no facts

21  demonstrating that such failure was a result of the doctor's deliberate indifference to serious

22  medical needs rather than Dr. Nangalama's belief that there was no medical reason for plaintiff to

23  get sick from the liquid form.  Indeed, on July 27, 2009, Dr. Nangalama added a prescription of

24  Naproxen in an effort to address plaintiff's pain complaints, and requested a follow-up with the

25  pain clinic.  During this alleged period of delay, plaintiff was seen by a neurosurgeon and

26

27  [10]  Indeed, side effects from Methadone, no matter the form, include nausea, vomiting, and loss of
appetite.  U.S. National Library of Medicine, MedlinePlus, "Methadone,"

28  https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682134.html, accessed February 24, 2016.

1   scheduled for epidural steroid injections for chronic pain.  Such treatment during this period does

2   not constitute deliberate indifference to plaintiff's serious medical needs.  Absent facts or medical

3   evidence to the contrary, Dr. Nangalama's failure to earlier return plaintiff to tablet form

4   Methadone constitutes at most negligence, gross negligence or medical malpractice, but not

5   deliberate indifference.  Accordingly, Dr. Nangalama is entitled to summary judgment on this

6   claim as well.

7        The court turns now to plaintiff's fifth claim against defendant Bakewell.  Defendant

8   Bakewell is entitled to summary judgment on plaintiff's fifth claim.  Plaintiff was scheduled to

9   see a nurse on July 10, 2009, and plaintiff was examined by RN Goodman.  Although plaintiff

10  disagreed with the treatment provided by Goodman, plaintiff may not establish deliberate

11  indifference by his subsequent failed attempts to obtain care by other medical professionals near

12  the time he was examined by Goodman.  Defendant Bakewell was not responsible for examining

13  and did not examine plaintiff on July 10, 2009.  Moreover, defendant Bakewell did not prescribe

14  the Methadone for plaintiff, and did not change the Methadone prescription.  (ECF No. 78-3 at 3.)

15  Thus, no reasonable juror could find that defendant Bakewell was deliberately indifferent to

16  plaintiff's serious medical needs where plaintiff was examined by a fellow medical professional

17  as scheduled on July 10, 2009.

18       Just as defendant Bakewell is entitled to summary judgment, so is defendant Sarver.  It is

19  undisputed that plaintiff was scheduled to see the nurse on July 10, 2009, and that plaintiff did not

20  have an appointment to see Dr. Nangalama on that date.  Thus, whether or not defendant Sarver

21  told plaintiff that Dr. Nangalama was not going to see plaintiff on July 10, 2009, defendant

22  Sarver's actions on July 10, 2009, fail to constitute deliberate indifference because plaintiff was

23  examined by RN Goodman on that date as scheduled.  Moreover, as plaintiff concedes, defendant

24  Sarver, an R.N., cannot prescribe Methadone, or change the form of a Methadone prescription.

25  (ECF No. 82 at 19 ("a nurse cannot prescribe Methadone to a patient or discontinue it."); see also

26  ECF No. 73-4 at 3 (Baidar Decl.).)  Therefore, defendant Sarver is entitled to summary judgment

27  on this claim.

28  ////

1

2

#### 4. Other Incidents

##### a. August 12, 2009 (Dr. Nangalama & Bakewell)

3      It is undisputed that on August 12, 2009, plaintiff was called to the medical clinic for an

4  appeal review.  In his third claim, plaintiff alleges that on August 12, 2009, during an appeal

5  review, Dr. Nangalama told plaintiff that if he withdrew his appeal, plaintiff would be provided

6  Methadone in pill form.  As plaintiff was previously informed, it is not a constitutional violation

7  for defendants to attempt to resolve an administrative appeal; indeed, it is fairly standard practice

8  for parties to attempt to negotiate settlement of pending claims.  (ECF No. 46 at 6.)  Plaintiff

9  adduced no evidence demonstrating that Dr. Nangalama was deliberately indifferent to plaintiff's

10  serious medical needs during this appeal review, and the meeting was for the purpose of

11  discussing plaintiff's appeal, not providing medical care.  Thus, Dr. Nangalama is entitled to

12  summary judgment on this claim.

13      In his fifth claim, plaintiff also contends that defendant Bakewell was deliberately

14  indifferent on August 12, 2009.  Plaintiff states he was called to B-clinic about Appeal SAC-10-

15  09-11646 regarding the alleged deliberate indifference of defendants Dr. Nangalama, Bakewell,

16  Sarver, and Hermann.  (ECF No. 17 at 26.)  Plaintiff argues that during this meeting, defendants

17  Dr. Nangalama and Bakewell told plaintiff that if he withdrew his appeal, they would give

18  plaintiff tablet Methadone.  When plaintiff refused, plaintiff claims that defendant Bakewell got

19  mad and hollered for plaintiff to "get the hell out," and for Dr. Nangalama "not to speak with

20  plaintiff."  (Id.)  When plaintiff asked Dr. Nangalama for something for plaintiff's stomach,

21  plaintiff claims that defendant Bakewell walked up into plaintiff's face and told him to "get out."

22  (Id.)  Plaintiff contends that defendant Bakewell was deliberately indifferent to plaintiff's serious

23  medical needs.

24      Defendants contend that plaintiff's allegations fail to provide evidence of deliberate

25  indifference; specifically, an interview and discussion about resolving an appeal cannot show

26  deliberate indifference.  Defendants argue that the interview was ended because plaintiff was

27  uncooperative.  (ECF No. 73-1 at 16.)  Defendant Bakewell declares that plaintiff became upset,

28  verbally aggressive and hostile, taking a forward stance against Bakewell, and was removed from

1   the meeting for safety.  (ECF No. 73-8 at 3.)  In any event, defendants contend that there was no

2   deliberate indifference because ultimately plaintiff was provided tablet form Methadone, even

3   though Dr. Nangalama did not believe it was medically necessary.

4        In addition, defendants provided a copy of defendant Bakewell's August 12, 2009

5   progress notes.  Bakewell noted that plaintiff was interviewed in connection with his appeal, and

6   he "refused alternative meds including liquid or to have it crushed -- or any meds for nausea -- he

7   wants it 'in pill form only opened in front of him by the [nursing] staff,'" claiming he doesn't

8   "trust anyone."  (ECF Nos. 73-5 at 17; 82 at 91.)  Defendant Bakewell noted:  "Rescheduled

9   [with] Appeals Coordinator & Psych for Paranoid Ideation."  (Id.)  On August 12, 2009,

10  defendant Bakewell ordered a psych referral for plaintiff.  (ECF Nos. 73-5 at 18; 82 at 92.)

11       Plaintiff disputes Bakewell's characterization of what occurred during the meeting, and

12  denies that he threatened Bakewell, claiming that had he threatened Bakewell, plaintiff would

13  have been placed in administrative segregation or issued a rules violation.  (ECF No. 82 at 55.)

14  However, a dispute as to the handling of an administrative appeal, or the negotiations in an effort

15  to resolve an appeal, do not raise a material dispute of fact as to whether Bakewell was

16  deliberately indifferent to plaintiff's serious medical needs.  Plaintiff provides no evidence to

17  support his claim that Bakewell was deliberately indifferent to his serious medical needs during

18  the August 12, 2009 appeals meeting.  (ECF No. 82 at 55-56.)  For example, plaintiff points to no

19  evidence demonstrating he presented with emergent medical issues that required emergency care.

20       As plaintiff was previously informed, it is not a constitutional violation for defendants to

21  attempt to resolve an administrative appeal; indeed, it is common for parties to attempt to

22  negotiate settlement of pending claims.  (ECF No. 46 at 6.)  Because this discussion

23  took place during an appeal review, and plaintiff submitted no evidence to support this claim,[11] no

24  —————————————

25  [11]  Throughout his declaration, plaintiff contends that certain defendants violated various prison
    regulations.  For example, plaintiff claims that defendant Bakewell violated § 3004 of title 15 of
26  the California Code of Regulations.  (ECF No. 82 at 56.)  Plaintiff argues that Dr. Nangalama
    violated § 3084 of title 15.  (ECF No. 82 at 55.)  However, violations of state prison rules and
27  regulations, without more, do not support any claims under section 1983.  Ove v. Gwinn, 264
    F.3d 817, 824 (9th Cir. 2001); Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir.
28  1997).  In addition, plaintiff alleges a violation of California Gov. Code  § 19572.  (ECF No. 82 at

1    reasonable jury could find that his allegations demonstrate a deliberate indifference to plaintiff's

2    medical needs.  Defendant Bakewell is entitled to summary judgment on this claim.

3                          b. October 6, 2010 Incident (Dr. Nangalama)

4         Plaintiff alleges that for several months prior to October 14, 2009, plaintiff complained to

5    Dr. Nangalama that plaintiff was frequently urinating after drinking water.  (ECF No. 17 at 21.)

6    On October 6, 2010, plaintiff saw Dr. Nangalama after taking a 14 day course of medication for

7    plaintiff's genital infection.  (ECF No. 17 at 22.)  Plaintiff contends that Dr. Nangalama

8    prescribed thyroid medication, but did not order anything for plaintiff's cholesterol or genital

9    infection.  Plaintiff also alleges that he had a heart attack on October 25, 2010.  (ECF No. 17 at

10   22.)

11        In opposition, defendants argue that plaintiff's complaints of chronic testicular pain have

12   been addressed by numerous medical exams, tests, and antibiotics.  (ECF No. 73-1 at 11.)  Dr.

13   Nangalama declares that on October 6, 2010, he examined plaintiff, who "complained of

14   testicular pain, but was not in distress."  (ECF No. 73-5 at 5.)  Dr. Nangalama found that the

15   exam and lab tests were normal, and he did not renew the antibiotic prescription because there

16   was no medical need.  (Id.)  Dr. Nangalama ordered plaintiff to continue his pain medications and

17   return to the clinic in six to eight weeks.  Dr. Nangalama ordered additional tests for plaintiff's

18   thyroid condition.  The doctor declares that no further medical treatment was needed at that time.

19   (Id.)

20        Plaintiff disputes that he was "not in distress," and that the "exam and lab tests were

21   normal."  (ECF No. 82 at 61.)  Plaintiff cites the ultrasound performed on November 10, 2010, in

22   which the doctor noted that the "findings suggest probably chronic left epididymitis and that

23   clinical correlation recommended."  (ECF No. 82 at 62.)  Plaintiff also attempts to refute Dr.

24   Nangalama's finding that no antibiotics were required on October 6, 2010, because on January 3,

25   2011, Dr. Nangalama ordered antibiotics and a blood test for plaintiff rather than referring

26

27   7.)  But plaintiff included no state law claims in the operative pleading.  (ECF No. 17, *passim*.)
     Here, the court proceeds on plaintiff's claims that defendants violated his constitutional rights
28   under the First and Eighth Amendments.

                                                  22

1    plaintiff to a urologist.  (ECF No. 82 at 62.)

2           However, plaintiff did not identify what lab tests he contends were not normal on October

3    6, 2010.  He does not describe his symptoms at the time he was seen on October 6, 2010.  Rather,

4    plaintiff states he was urinating frequently prior to October 14, 2009, almost one year prior to the

5    appointment.  In addition, plaintiff concedes he had just completed a course of antibiotics.

6    Although the subsequently performed ultrasound suggested chronic epiddymitis, the doctor

7    recommended clinical correlation.  Dr. Nangalama declared there was no clinical correlation.

8    (ECF No. 73-5 at 5.)  In Dr. Nangalama's medical opinion, there was no medical need for

9    additional antibiotics on October 6, 2010, and plaintiff presents no competent medical evidence to

10   the contrary.  At bottom, plaintiff's claim concerning Dr. Nangalama's care on October 6, 2010,

11   reflects a mere difference of opinion as to plaintiff's medical care, not deliberate indifference.

12          As to plaintiff's allegations concerning "high cholesterol" and his alleged subsequent

13   heart attack, plaintiff's claim also fails for lack of evidence.

14          Plaintiff argues that Dr. Nangalama's assertions are false, that plaintiff did have a heart

15   attack, citing the San Joaquin Hospital Report appended to Dr. Nangalama's declaration,[12] and

16   that plaintiff was given six nitroglycerin tablets.  (ECF No. 82 at 62.)  Plaintiff contends that his

17   heart attack was the result of Dr. Nangalama failing to prescribe plaintiff medication for his high

18   cholesterol.  (ECF No. 82 at 22.)  Plaintiff argues that Dr. Nangalama was aware prior to October

19   6, 2010, that plaintiff's cholesterol was "way too high, and failed to prescribe any medication for

20   it."  (ECF No. 82 at 22.)  Plaintiff cites to his Exhibit L18, which contains the results from a June

21   18, 2010 cholesterol test.  (ECF No. 82 at 128.)

22          However, the evidence shows that on October 25, 2010, plaintiff complained of chest

23   pain, and was evaluated and treated at the prison, including receiving nitroglycerin, and was then

24   transferred by ambulance to the San Joaquin General Hospital Emergency Department.  His ECG

25   was normal.  (ECF No. 73-5 at 60.)  Plaintiff's final diagnosis was non-cardial chest pain, and

26   that plaintiff did not have a heart attack.  (ECF No. 73-1 at 11.)

27   ─────────────

28   [12]  The records from the outside emergency room encompass 23 pages.  (ECF No. 73-5 at 50-73.)
     Plaintiff did not cite to a specific page or identify the report to which he refers.

Moreover, plaintiff's June 18, 2010 cholesterol results reflect that plaintiff was at "average risk" based on his LDL/HDL ratio of 3.25.  (ECF No. 82 at 128.)  Plaintiff presents no medical evidence demonstrating that he should have been placed on medication on the basis of such test results.  Finally, it is undisputed that plaintiff was prescribed Simvastatin shortly after the October 26, 2010 episode.  (ECF No. 73-5 at 87.)

Thus, defendant Dr. Nangalama is entitled to summary judgment on this claim.

c.  Three Incidents in February 2011 (Dr. Nangalama)

Plaintiff contends that on February 14, 2011, he went to see defendant Baidar about not receiving prescribed medication, and when Baidar called the pharmacy, Baidar was told that plaintiff was sent the full amount.  (ECF No. 17 at 22.)  Plaintiff alleged that when he asked Baidar for the name of the pharmacy staff person so plaintiff could file an appeal, Baidar "got mad," went to Dr. Nangalama and told the doctor to take plaintiff off his pain medication.  (Id.)  Baidar put plaintiff on the doctor line in 14 days, and Dr. Nangalama agreed.

On February 28, 2011, plaintiff alleges that when he was seen by Dr. Nangalama concerning not receiving his medication, Dr. Nangalama asked plaintiff for some urine.  (ECF No. 17 at 22.)  Plaintiff told Dr. Nangalama he had been waiting 20 to 30 minutes and could have had the nurse get urine, "but plaintiff had to go back to his cell and type up some legal papers because they had to be sent out that night."  (ECF No. 17 at 22.)  Plaintiff told Dr. Nangalama that if he gave plaintiff the urine bottle, he would give the urine to the nurse when the nurse came by in the evening.  Dr. Nangalama refused.  (Id.)  When he was leaving, plaintiff alleges that defendants Sarver and Dr. Nangalama "stated plaintiff was filing all those appeals saying they were deliberately indifferent to his medical needs."  (Id.)  Plaintiff also alleges that Dr. Nangalama falsified a refusal of examination report stating that plaintiff refused a urine test on February 28, 2011.

Defendants argue that the evidence shows plaintiff's allegations are false, that medical staff immediately responded to plaintiff's complaint, that he received his medications, and that plaintiff refused the urinalysis.  (ECF No. 73-1 at 12.)  Specifically, defendants point to medical records reflecting that Sulfamethoxazole was delivered to plaintiff on January 27, 2011, Dr.

24

1    Nangalama renewed plaintiff's pain medication prescription for 90 days on February 2, 2011, and

2    such prescription remained in effect after plaintiff was seen by the doctor on February 28, 2011,

3    and March 22, 2011.  (ECF No. 73-1 at 12.)  Dr. Nangalama declares that he saw plaintiff on

4    February 28, 2011, for the complaint of testicular pain, but that plaintiff claimed he had not been

5    receiving his medications.  (ECF No. 73-5 at 6.)  As to the urine sample, defendants argue that

6    plaintiff's own allegations confirm that he refused the urinalysis.  Dr. Nangalama declares that the

7    urine sample could help determine the cause of plaintiff's testicular pain, and could determine

8    what medications were in plaintiff's system at that time.  (ECF No. 73-5 at 6.)  Dr. Nangalama

9    declares that the pharmacy record showed that his medications were delivered, specifically, the

10   Sulfamethoxazole, commonly known as "Bactrim," and "it was unclear why he would not be

11   taking it."  (ECF No. 73-5 at 6.)

12          Plaintiff declares that he could not provide a urine sample because he had recently

13   urinated and did not need to urinate when asked by the doctor to provide a sample.  (ECF No. 82

14   at 69, see also ECF No. 17-2 at 46.)  However, plaintiff could have drunk additional water and

15   waited in the clinic to provide a sample.  Plaintiff concedes that Dr. Nangalama wanted plaintiff

16   to wait in the hallway, but that "he needed to get back to his cell and type up some legal papers

17   because they had to be mailed out that night."  (ECF No. 17 at 13.)  Defendants are correct that

18   plaintiff cannot dictate the manner in which medical care is provided.  But even if Dr. Nangalama

19   refused to allow plaintiff to provide a urine sample while plaintiff was in his cell, plaintiff's belief

20   that he should have been allowed to do so constitutes a mere difference of opinion, not deliberate

21   indifference.  Accordingly, Dr. Nangalama is entitled to summary judgment on the claim

22   concerning plaintiff's urine sample.

23          With regard to plaintiff's medication, despite plaintiff's difference of opinion as to what

24   transpired between plaintiff and defendant Baidar in connection with the Sulfamethoxazole

25   prescription,[13] plaintiff adduced no evidence that Dr. Nangalama was aware of any discrepancy in

26   _____

27   [13]  Defendants presented evidence that Baidar and Dr. Nangalama did not have a medical visit
     with plaintiff on February 14, 2011.  (ECF No. 73-4 at 2; 73-5 at 5.)  Plaintiff did not rebut this
     evidence with competent evidence; rather, plaintiff speculates that the February 14, 2011 visit

28   must have occurred based on the routine scheduling of appointments in 14 day increments.  (ECF

the delivery of the Sulfamethoxazole prescription after plaintiff was seen on January 27, 2011,[14] and plaintiff presented no pharmacy record or reconciliation form rectifying an alleged error in the delivery of such medication on January 27, 2011. Rather, the evidence demonstrates that the January 3, 2011 prescription was not provided to plaintiff.[15] Moreover, plaintiff submitted no documentary evidence demonstrating that a subsequent medicine shortage was rectified by the pharmacy.

Finally, plaintiff presented no medical or pharmacy records demonstrating that Dr. Nangalama discontinued plaintiff's Methadone prescription, whether at Baidar's request or not. Rather, the evidence shows that plaintiff was prescribed Methadone throughout the relevant period here. Thus, plaintiff failed to rebut defendants' evidence that plaintiff was continuously prescribed pain medication.

For all of these reasons, defendant Dr. Nangalama is entitled to summary judgment on plaintiff's deliberate indifference claims based on February 2011 incidents.

////

---

No. 82 at 64.) Plaintiff cites his appeal, HC 11-13677, in which he claims he had a medical visit with RN Sayed on February 14, 2011 concerning his claim that he only received pills for 8 days rather than 21 days. (ECF No. 17-2 at 48.) But in reviewing plaintiff's Unit Health Record for the first level response, the reviewer did not include reference to a February 14, 2011 record. (ECF No. 17-02 at 48-49.) In any event, no medical record for February 14, 2011 was presented to the court.

[14] Plaintiff declares that he "stated to defendant A. Nangalama, on January 27, 2011, he got eight 8-days' worth of the medication." (ECF No. 82 at 68.) However, plaintiff was seen in the medical clinic at 11:00 a.m. on January 27, 2011, at which time the pharmacy was contacted. (ECF No. 73-4 at 6.) In his appeal, HC 11-13677, plaintiff stated that on the evening of January 27, 2011, he was only given 8 days' worth of pills. (ECF No. 17-2 at 48.) Plaintiff fails to explain how he could have told Dr. Nangalama about this shortage on January 27, 2011, during his morning appointment, when the alleged shortage did not occur until that evening. Moreover, no pharmacy reconciliation form addressing the alleged shortage was presented to the court.

[15] But even assuming, *arguendo*, that plaintiff was shorted some portion of his antibiotic prescription, it appears undisputed that the antibiotic prescriptions were not effective in addressing plaintiff's complaints about his genital area. Plaintiff was subsequently referred to a urologist, who prescribed Elmiron based on a probable diagnosis of interstitial cystitis. (ECF No. 82 at 108.) Elmiron is not an antibiotic, but is pentosane polysulfate sodium, used to treat pain or discomfort associated with interstitial cystitis. Janssen Pharmaceuticals, Inc., http://www.orthoelmiron.com/about-elmiron, accessed February 23, 2016.

1          d. <u>March 10, 2010 Incident (Dr. Nangalama)</u>

2          Plaintiff claims that Dr. Nangalama falsified his report stating that he interviewed plaintiff

3     on March 10, 2010, concerning appeal SAC-10-09-12711, in which plaintiff alleged that

4     defendant Bakewell called plaintiff and the doctor "niggers."  (ECF No. 17 at 22.)  However,

5     such allegation does not address the provision of, or failure to provide, medical care; thus, any

6     allegations pertaining to such appeal do not constitute a violation of the Eighth Amendment.

7     Moreover, plaintiff's claims concerning verbal harassment are insufficient to state a cognizable

8     civil rights claim, as plaintiff was previously informed.  (ECF No. 19 at 6.)  Defendant Dr.

9     Nangalama is entitled to summary judgment on this claim.

10          e. <u>May 5, 2011 Incidents (Dr. Nangalama)</u>

11          Plaintiff alleges that defendant Dr. Nangalama waited until May 5, 2011, to refer plaintiff

12    to an Ear, Nose, and Throat ("ENT") specialist and a urologist, despite knowing that plaintiff was

13    sleep-deprived and had an infection in his genitals.  (ECF No. 17 at 23.)

14          Defendants contend that plaintiff did not complain of any tinnitus or ENT issues during

15    his January 27, February 2, February 28, and March 23, 2011 visits; rather, the first complaint

16    about such issue was during the May 5, 2011 visit.  (ECF No. 73-1 at 14.)  On May 5, 2011,

17    defendant Dr. Nangalama recommended a referral to an ENT specialist outside the prison.

18    Although the request was subsequently denied by a medical committee because they

19    recommended an audiology evaluation first, defendants contend that Dr. Nangalama was not

20    deliberately indifferent to plaintiff's ENT issues because he recommended the referral.  Further,

21    defendants argue that the totality of plaintiff's myriad medical treatments demonstrate that Dr.

22    Nangalama was not deliberately indifferent to plaintiff's medical needs.  Defendants provided a

23    copy of plaintiff's January 24, 2011 request for health care services in which plaintiff sought to

24    see the doctor to have an expired thyroid medication renewed, and noted that he had not received

25    the antibiotic to treat his genital infection.  (ECF No. 73-5 at 100.)  Plaintiff did not mention ear

26    ringing in this request form.  (<u>Id.</u>)  On January 31, 2011, plaintiff was prescribed Methadone and

27    Gabapentin.  (ECF No. 73-5 at 101.)

28    ////

1    Plaintiff counters that defendant Dr. Nangalama was aware of these conditions from

2    reports in November of 2010 and January 3, 2011, and that plaintiff had an infection in his

3    genitals on February 9, 2011, and that plaintiff's ears were ringing.  (ECF No. 82 at 26.)  In his

4    declaration, plaintiff states that he told defendant Baidar on January 27, 2011, February 9, 2011,

5    and February 14, 2011, and told defendant Dr. Nangalama on February 2, 2011, February 28,

6    2011, and March 23, 2011, "and every other occasion he was able to see him," that plaintiff's ears

7    were ringing and painful, and that plaintiff had an enlarged prostate and pain in his genitals.

8    (ECF No. 82 at 82.)  On February 9, 2011, plaintiff filed appeal HC 11-13478, requesting to see

9    an ear specialist to find out why his ears are ringing so loud, and that he receive the appropriate

10   treatment to cure the infections in his genitals.  (ECF No. 17-2 at 32.)  In his request for second

11   level review, plaintiff stated that on February 2, 2011, he told Dr. Nangalama that plaintiff was in

12   pain in his genitals and that his ears were ringing.  (ECF No. 17-2 at 35.)  Plaintiff's ears began

13   ringing in January of 2011.  (ECF No. 17-2 at 35, 36.)

14          Delays in providing medical care may manifest deliberate indifference.  Estelle, 429 U.S.

15   at 104-05.  To establish a claim of deliberate indifference arising from delay in providing care, a

16   plaintiff must show that the delay was harmful.  See Hallett v. Morgan, 296 F.3d 732, 745-46 (9th

17   Cir. 2002) (delays without significant harm do not constitute an Eighth Amendment violation);

18   Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (mere delay

19   of surgery is insufficient absent evidence the denial was harmful).  Thus, "[a] prisoner need not

20   show his harm was substantial; however, such would provide additional support for the inmate's

21   claim that the defendant was deliberately indifferent to his needs."  Jett, 439 F.3d at 1096.

22                    i.  Referral to ENT

23          With regard to plaintiff's complaint of ear ringing, plaintiff fails to demonstrate that Dr.

24   Nangalama was aware of such complaint through conversations with Baidar or Sayed.  Plaintiff

25   did not provide a declaration from either of them concerning their alleged conversations with Dr.

26   Nangalama in connection with ear ringing.  Despite Dr. Nangalama's declaration stating that

27   plaintiff did not mention ear problems during visits on January 27, 2011, February 2, 2011,

28   February 28, 2011, or March 23, 2011, plaintiff declares that he told Dr. Nangalama about the ear

1    ringing on February 2, 2011, February 28, 2011, and March 23, 2011, and the February 2, 2011

2    exchange is referenced in plaintiff's administrative appeal.  That said, plaintiff has utterly failed

3    to demonstrate or identify an excessive risk of harm from the delay.  At the time plaintiff was

4    suffering the ear ringing, he was on two different medications for pain:  Methadone and

5    Gabapentin.  In addition, plaintiff does not indicate whether he still suffers from ear ringing, and

6    does not report the results of any subsequent audiology testing.  Thus, plaintiff failed to

7    demonstrate a substantial risk of serious harm resulted from the delay.

8         It is undisputed that Dr. Nangalama referred plaintiff to an ENT specialist on May 5,

9    2011.  Here, plaintiff began suffering ear ringing in January of 2011, and was referred to a

10   specialist on May 5, 2011.  Absent evidence of further harm, no reasonable juror could find that

11   such delay demonstrated deliberate indifference on the part of Dr. Nangalama.  See, e.g., Jett, 439

12   F.3d at 1097 (inmate presented sufficient information to present a genuine issue of material fact

13   where inmate had fractured his thumb yet did not see a hand specialist, as recommended by other

14   treating doctors, for more than nineteen months after the initial injury, in which time the fracture

15   had healed badly, resulting in continuing diminished use of the hand); Shapely, 766 F.2d at 407

16   ("[M]ere delay of surgery, without more, is insufficient to state a claim of deliberate medical

17   indifference. . . .  [Prisoner] would have no claim for deliberate medical indifference unless the

18   denial was harmful.")  Thus, defendant Dr. Nangalama is entitled to summary judgment on the

19   claim concerning ear ringing.

20              ii.  Referral to Urologist

21        Plaintiff contends that defendant Dr. Nangalama violated plaintiff's Eighth Amendment

22   rights by failing to earlier refer plaintiff to a urologist.  Plaintiff claims that on January 3, 2011,

23   Dr. Nangalama ordered antibiotics and a blood test for plaintiff rather than referring plaintiff to a

24   urologist.  (ECF No. 82 at 62.)

25        The record reflects that plaintiff complained of pain in his testes as early as September 7,

26   2010.  Dr. Dhillon referred plaintiff for an ultrasound, which suggested "probably chronic left

27   epididymitis.  Clinical correlation is recommended."  (ECF No. 82 at 157.)

28   ////

1    Dr. Nangalama opines that the ultrasound revealed only a probable infection that required

2    clinical correlation, and that "there was no apparent injury or condition that caused plaintiff's

3    complaint." (ECF No. 73-5 at 5.)  Moreover, epididymitis is an "infection [that] is easily

4    treatable and curable with antibiotics."  (ECF No. 73-5 at 4.)  The record reflects that plaintiff

5    was examined on several occasions for his complaints of genital pain, and that he was prescribed

6    at least two courses of antibiotics.  Dr. Nangalama referred plaintiff to a urologist on May 5,

7    2011.  It was not until June 29, 2011, that plaintiff was diagnosed with "probable interstitial

8    cystitis." (ECF No. 82 at 108.)

9    A prison doctor's provision of care constitutes medical indifference where the doctor

10    ignores a previous treating physician's instructions, knows that a course of treatment was

11    ineffective but continued it anyway, or delays necessary treatment without justification.  See Jett,

12    439 F.3d at 1097-1098.

13    Plaintiff points to no facts demonstrating that Dr. Nangalama acted with a culpable state

14    of mind in connection with plaintiff's complaints of genital pain.  Rather, the record reflects that

15    Dr. Nangalama reviewed the ultrasound, which showed no injury or condition that would cause

16    plaintiff's pain.  As conceded by plaintiff, Dr. Nangalama treated plaintiff's pain with a blood test

17    and antibiotics.  But such treatment, standing alone, does not demonstrate deliberate indifference.

18    Plaintiff believes he should have been referred to a specialist on January 3, 2011, rather than May

19    5, 2011.  However, Dr. Nangalama believed plaintiff was suffering from epididymitis, the

20    treatment for which was antibiotics.  Thus, plaintiff's belief that he should have been referred to a

21    urologist on January 3, 2011, reflects a difference of opinion.  Moreover, Dr. Fawcett noted that

22    plaintiff's symptoms and pain were "not documentable."  Thus, to the extent Dr. Nangalama

23    misdiagnosed plaintiff's condition, such misdiagnosis constitutes negligence or possible medical

24    malpractice, not deliberate indifference.  Similarly, to the extent that the delay in referring

25    plaintiff to a urologist was the result of Dr. Nangalama's misdiagnosis, such error constitutes

26    negligence, not deliberate indifference.  Plaintiff points to no evidence suggesting that Dr.

27    Nangalama intentionally delayed the referral.  In light of the record evidence, no reasonable juror

28    could find that the delay in referring plaintiff to a urologist constituted deliberate indifference.

30

VII.  Retaliation Claims

As set forth above, plaintiff pursues multiple claims of retaliation against defendants.  The court will first set forth the standards governing such claims, and will then address each claim seriatim.

A.  Legal Standards

Retaliation by a state actor for the exercise of a constitutional right is actionable under § 1983 even if the act would have been proper or justified under different circumstances.  See Mt. Healthy City Bd. of Education v. Doyle, 429 U.S. 274, 283-84 (1977).  In the prison context, a plaintiff alleging unconstitutional retaliation must show:  (1) that a state actor took some adverse action against him (2) because of (3) the prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.  Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009); Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).  It is well established that "[p]risoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so."  Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012); see also Silva v. Di Vittorio, 658 F.3d 1090, 1104 (9th Cir. 2011) (prisoners retain First Amendment rights not inconsistent with their prisoner status or penological objectives, including the right to file inmate appeals and the right to pursue civil rights litigation).

Retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'"  Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995) (quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)).  In particular, courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory."  Id. (quoting Sandin, 515 U.S. at 482).

B.  Second Claim (Dr. Nangalama)

Plaintiff asserts that defendant Dr. Nangalama retaliated against him for exercising his First Amendment rights on August 12, 2009.

1

[O]n August 12, 2009 plaintiff was called to B Clinic about Appeal
SAC-10-09-11646 regarding defendants S. Hermann, K. Sarver, C.

2
Bakewell and A. Nangalama being deliberately indifference [sic] to
his serious medical needs, during the appeal review defendant's C.

3
Bakewell, A. Nangalama, and D. [McDowell] stated to plaintiff that
if he withdrawal [sic] his appeal, they would give him the

4
Methadone back in pill form, when plaintiff refused, defendant C.
Bakewell got mad and started hollering at plaintiff to get the hell

5
out[.] [D]efendant A. Nangalama refused to give plaintiff anything
for the pain in his stomach.

6

7       (ECF No. 17 at 18-19.)[16]

8               Defendants contend that Dr. Nangalama did not retaliate against plaintiff by interviewing

9       him about his appeal, and offering solutions.  Dr. Nangalama declares that he did not retaliate

10      against plaintiff.  (ECF No. 73-5 at 4.)  Moreover, defendants argue that plaintiff ultimately

11      received the requested change in medication form.  (ECF No. 73-1 at 18.)

12              In his opposition, plaintiff repeats his claims that during the meeting, plaintiff asked

13      defendants Dr. Nangalama and Bakewell "were they retaliating and discriminating against

14      [plaintiff] for filing appeals and inmates abusing their medications, they stated 'yes.'"  (ECF No.

15      82 at 20; 17 at 8 (unverified third amended complaint.)  However, such allegations are not

16      verified by plaintiff.  (ECF No. 82 at 20.)  The exhibits cited by plaintiff in support of these

17      allegations in his pleading are to his administrative appeals, which are also not verified.  (ECF

18      No. 17 at 49-50.)  Accordingly, the court does not address such allegations.

19              In his declaration, plaintiff avers that Dr. Nangalama was not authorized to hear plaintiff's

20      appeal.  (ECF No. 82 at 54.)  Plaintiff disputes defendant Bakewell's characterization of

21      plaintiff's threatening behavior during the meeting.  (ECF No. 82 at 55.)  Plaintiff then declares

22      that defendants Dr. Nangalama and Bakewell "retaliated against plaintiff for filing appeals against

23      them and falsified their reports to try to cover it up."  (ECF No. 82 at 56.)  Plaintiff offers no

---

24      [16]  Although plaintiff included other incidents in his pleading alleging retaliation by Dr.
Nangalama, the screening order solely and specifically identified the August 12, 2009 allegations

25      and did not include the remaining allegations concerning retaliation by Dr. Nangalama.  (ECF No.
19 at 5) ("The allegations stated above state a potential retaliation claim against Dr. Nangalama."

26      (emphasis added).)  In any event, the court has reviewed such additional allegations and found
that plaintiff failed to state cognizable retaliation claims based on such incidents because plaintiff

27      failed to allege facts or adduce evidence connecting such events with conduct protected under the
First Amendment.

28

1   further facts or evidence in support of his claim that Dr. Nangalama took an adverse action in

2   response to plaintiff's protected conduct.

3          Defendants presented evidence that Dr. Nangalama was attempting to resolve plaintiff's

4   appeal concerning the form of Methadone provided.  Attempts to settle administrative appeals do

5   not violate the Constitution.  Plaintiff identifies no adverse action taken in response to this

6   meeting; indeed, plaintiff's medications continued as ordered.  Whether or not Dr. Nangalama

7   was permitted, under prison regulations, to hold such a meeting does not raise a constitutional

8   question.  Similarly, the dispute between plaintiff and defendant Bakewell as to how the meeting

9   proceeded or ended does not present a triable issue of material fact as to whether Dr. Nangalama

10  retaliated against plaintiff during or after the meeting.  Thus, defendant Dr. Nangalama met his

11  burden in demonstrating that he did not retaliate against plaintiff on August 12, 2009, and

12  plaintiff failed to rebut such evidence.  In addition, it is undisputed that Dr. Nangalama

13  subsequently returned plaintiff to pill form Methadone.  Therefore, Dr. Nangalama is entitled to

14  summary judgment on this claim.

15          C.  Fourth Claim (Bakewell)

16          Plaintiff states that:

17              [O]n August 12, 2009, plaintiff was called to B-Clinic about Appeal
                SAC-10-09-11646 regarding defendants C. Bakewell, S. Hermann,
18              K. Sarver, and A. Nangalama being deliberate indifferent to his
                serious medical need, during the appeal review defendants C.
19              Bakewell, A. Nangalama, and D. [McDowell] stated to plaintiff if
                he withdr[ew] his appeal they would give him the Methadone back
20              in pill form when plaintiff refused defendant C. Bakewell got mad
                and started hollering at plaintiff to get the hell out and for defendant
21              A. Nangalama when plaintiff asked defendant A. Nangalama for
                something for his stomach she walked up to plaintiff face and said
22              get out.

23  (ECF No. 17 at 24.)[17]  The court initially described this claim as plaintiff alleged an adverse

24  _____

    [17]  Although plaintiff pled other incidents alleging retaliation by defendant Bakewell, such claims
25  were not included in the screening order.  Rather, the screening order solely and specifically
    identified the August 12, 2009 allegations and did not include the remaining allegations
26  concerning retaliation by defendant Bakewell.  (ECF No. 19 at 5-6.)  In any event, the court has
    reviewed the additional allegations and found that plaintiff failed to state a retaliation claim based
27  on the July 10, 2009 incident because plaintiff failed to allege any facts connecting such events
    with his conduct protected under the First Amendment.  Similarly, plaintiff's alleged retaliation
28

1  action (the refusal of medication), because of plaintiff's failure to withdraw his grievance on

2  appeal which chilled the inmate's exercise of his First Amendment rights, without a legitimate

3  penological goal or interest.  (ECF No. 19 at 6.)

4       Defendant Bakewell declares that she and Dr. Nangalama interviewed plaintiff about the

5  Methadone issue and his appeal, informed him about the policy that caused the change in the

6  form of Methadone provided, and discussed ways to resolve the appeal, including providing

7  Methadone pills.  (ECF No. 73-8 at 2.)  Defendant Bakewell did not prescribe the Methadone for

8  plaintiff, and did not change the form of the Methadone prescription provided.  (ECF No. 73-8 at

9  3.)

10      In opposition, plaintiff points out that defendant Bakewell did not mention plaintiff's

11  alleged aggressive behavior when she responded to plaintiff's appeal.  (ECF No. 82 at 57.)

12      Here, defendant Bakewell is entitled to summary judgment for the same reasons as Dr.

13  Nangalama.  Both Bakewell and Dr. Nangalama were attempting to resolve an appeals dispute

14  with plaintiff.  In an effort to resolve the appeal, Dr. Nangalama offered to provide plaintiff

15  Methadone in pill form.  Despite plaintiff's disagreement as to how the meeting proceeded or

16  ended, it is undisputed that plaintiff was not in the meeting to obtain medical treatment; rather, he

17  was there to discuss the Methadone issue and his appeal.  In addition, none of plaintiff's

18  medications were discontinued during the meeting or as a result of the meeting.  It is undisputed

19  that plaintiff's prescription for Methadone was 10 mg whether prescribed in liquid or pill form.

20  Thus, plaintiff failed to identify an adverse action resulting from the actions of defendant

21  Bakewell on August 12, 2009.  Finally, it is undisputed that plaintiff's Methadone prescription

22  was subsequently returned to pill form.  Thus, plaintiff has failed to adduce facts or evidence

23  demonstrating that defendant Bakewell retaliated against plaintiff on August 12, 2009.

24  ////

25  ////

26  _____

27  claims against defendant Bakewell based on the August 28, 2009 (Bakewell claimed plaintiff was
   uncooperative in the appeals process), and September 18, 2009 (verbal abuse) incidents fail to
   state cognizable retaliation claims under the First Amendment because he identified no adverse

28  action taken in response to protected conduct.

1    D. Seventh Claim (Sarver)

2        Plaintiff raises retaliation claims against defendant K. Sarver based on incidents that

3    occurred on July 10, 2009, and February 28, 2011.

4                            i. July 10, 2009 Incident

5        First Incident.  On July 10, 2009 Plaintiff was called to B. Clinic to
         see the R.N. about the adverse effect of the liquid Methadone and
6        seen defendant A. Nangalama and explained to him that the liquid
         Methadone was causing him to throw up, throw up blood at times
7        he sta[t]ed to sit down on the bench and he would see Plaintiff.
         Plaintiff repeated this to defendant K. Sarver defendant K. Sarver
8        stated to Plaintiff that defendant A. Nangalama was not seeing him
         and went to get defendant S. Hermann and prevented plaintiff from
9        seeing A. Nangalama.

10    (ECF No. 17 at 29.)  Essentially, plaintiff alleges that defendant Sarver prevented him from

11    seeing Dr. Nangalama even though plaintiff had a serious medical need.  Later, plaintiff asserts

12    that this adverse action was done in retaliation for plaintiff exercising his First Amendment rights

13    which had a chilling effect on those rights.

14        Plaintiff fails to identify the protected conduct he was engaged in on July 10, 2009.  As

15    discussed above, it is undisputed that plaintiff was called to medical to see the nurse for a medical

16    visit, and he saw nurse Goodman.  A medical visit does not constitute protected conduct under the

17    First Amendment.  Plaintiff attempted to see the doctor, but defendants adduced evidence that the

18    doctor was assigned to doctor line that morning.  In addition, nurses in the medical clinic have a

19    legitimate reason for enforcing appointments and requiring inmates to conform to processes for

20    obtaining medical care.  Thus, defendant Sarver is entitled to summary judgment on this claim.

21                            ii. February 28, 2011 Incident

22        On February 28, 2011 Plaintiff was call[ed] to see defendant A.
         Nangalama about not getting the medication he ordered for Plaintiff
23        on 1-27-11 defendant A. Nangalama asked Plaintiff to pull his pants
         down so he could see his genitals defendant K. Sarver went to get
24        defendant E. Colter and told him to go to defendant A. Nangalama
         office and listen to what the Plaintiff and defendant A. Nangalama
25        was saying because the Plaintiff was suing the both of them and
         always writing them up. [D]efendant E. Colter came into the room
26        and started listening.

27        On February 28, 2011 defendant K. Sarver stated Plaintiff refused a
         urine test in violation of his First Amendment rights and that
28        defendant chilled the effect of Plaintiff ex[e]rcise of his First

                                    35

1    Amendment rights through actions that did not advance any
2    legitimate penological goals nor tailored narrowly enough to.

3    (ECF No. 17 at 29-30.)

4        Defendant Sarver declares that she called defendant Colter in to the exam room to serve as

5    a witness because plaintiff had testicular complaints, and because Sarver is female, she tried to

6    avoid being present during male genital exams.  (ECF No. 73-6 at 3.)  Moreover, defendant

7    Sarver declares that she felt that defendant Colter would be a good security presence because she

8    was uncomfortable around plaintiff because he was not happy.  (ECF No. 73-6 at 3.)

9        Plaintiff declares that defendant Sarver retaliated against plaintiff by bringing defendant

10   Colter into the medical exam to interfere with plaintiff's medical treatment when there was no

11   security issues, by telling Colter to listen in on what was said "because plaintiff was writing

12   defendants Sarver and Nangalama up and suing the both of them," and then by falsely claiming

13   that plaintiff refused a urinalysis.  (ECF No. 82 at 68.)

14       However, as discussed above, it is undisputed that plaintiff did not want to wait in the

15   hallway to provide a urine sample, and although plaintiff was previously allowed to provide urine

16   samples in his cell, plaintiff is not allowed to dictate how medical treatment is administered.

17   Moreover, plaintiff fails to identify how defendant Sarver's actions constitute an adverse action.

18   Plaintiff does not adduce evidence that Colter's presence during the exam interfered with the

19   medical exam.  Plaintiff provides no evidence that Sarver used any information Colter may have

20   gleaned during the exam in a manner adverse to plaintiff.  Moreover, defendant Sarver's signature

21   as a witness on the CDC 7225 Refusal of Examination and/or Treatment (ECF No. 73-6 at 3) to

22   document plaintiff's refusal is a legitimate correctional action.  Similarly, whether or not plaintiff

23   believed a security presence was needed during the medical exam, defendant Sarver's

24   determination that a security presence was needed is a legitimate correctional reason for such

25   presence.  Accordingly, defendant Sarver is entitled to summary judgment on this claim.

26       E.  Eleventh Claim (Baidar)

27       Plaintiff alleges that defendant Baidar retaliated against him on February 14, 2011, by

28   ignoring his complaint about his medication, and telling Dr. Nangalama to take plaintiff off his

36

1    pain medications.  (ECF No. 17 at 34-35.)  However, as discussed above, the documentary

2    evidence reflects plaintiff's pain medication was not discontinued or interrupted.  Defendant

3    Baidar declares that there is no record of plaintiff having a medical visit on February 14, 2011.

4    Plaintiff failed to adduce documentary evidence that he had a medical appointment with

5    defendant Baidar on February 14, 2011, and did not produce a pharmacy reconciliation form

6    confirming that plaintiff was shortchanged pills in his January 27, 2011 antibiotic prescription.

7    Finally, in his opposition, plaintiff failed to address the elements of a retaliation claim.  (ECF No.

8    82 at 28:5-9; 30, 31, 33.)

9            For all of these reasons, defendant Baidar is entitled to summary judgment.

10                   F.   Thirteenth Claim (Lopez)

11           Plaintiff contends defendant Lopez retaliated against plaintiff based on her actions on two

12   occasions, March 24, 2011, and March 28, 2011.[18]  Specifically, plaintiff claims that on March

13   23, 2011, after defendants Colter and Lopez brought plaintiff into medical to meet with Dr.

14   Nangalama,

15                   Plaintiff forgot he left his paper work in defendant A.
                Nangalama['s] office and was about to go back to get it and
16              defendant E. Colter jumped in his path. Plaintiff was taking the
                urine back to the nurse and defendant A. Lopez walked up to
17              plaintiff smelling like alcohol with plaintiff['s] chronos in her
                hand[.] [She] began talking crazy to plaintiff. Plaintiff told her he
18              was writing her up.

19   (ECF No. 17 at 37-38.)  The next day, March 24, 2011, plaintiff alleges that defendants Colter

20   and Lopez "came to housing B-6 and hollered to all inmates they were only allowing one inmate

21   at the medication cart at a time and they could thank plaintiff."  (ECF No. 17 at 38.)

22                   On March 28, 2011, plaintiff tried to give defendants E. Colter and
                A. Lopez a copy of the memorandum by CSP-SAC Warden
23              regarding medication distribution. [D]efendants stated fuck that
                memo. [D]efendant A. Lopez walked up to plaintiff and said I do
24              not want nothing from your snitch ass while a group of inmates
                were standing around listening in violation of his First Amendment
25              rights and that defendant chilled the effect of plaintiff['s] exercise
                of his First Amendment rights through actions that did not advance
26              any legitimate penological goals nor are tailored narrowly enough

27   ────────────────────
     [18]  Plaintiff's allegations that defendant Lopez retaliated against plaintiff based on the events of
28   March 23, 2011, were dismissed.  (ECF No. 46 at 12-13; 52.)

1    to achieve such goals.

2    (ECF No. 17 at 38.)

3         Plaintiff provided signed declarations from inmates Reeda and Nicholson (ECF No. 17-5

4    at 19 & 21) confirming that they witnessed defendant Lopez's comments on March 24, 2011, and

5    both added the statement:  "And that's what happens when people get to snitching."  (Id.)  Inmate

6    Nicholson further declares that he witnessed the events of March 28, 2011, and saw defendant

7    Lopez walk up to plaintiff and aggressively get in his face and state:  "I don't want nothing from

8    your snitch ass." (ECF No. 17-5 at 22.)

9         Defendants argue that refusing to accept a memo or attributing the change in access to the

10   medication cart to plaintiff are not adverse actions, and that plaintiff failed to provide evidence

11   that defendant Lopez' actions were retaliatory.  Defendants provide the declaration of defendant

12   Colter who states:

13            On March 28, 2011, I was escorting medical staff in plaintiff's
              housing unit as the staff passed out medications to inmates.  There
14            had recently been a change in prison procedure for passing out
              medications, and some of the inmates were upset about it.  Plaintiff
15            tried to hand me a memorandum regarding medication policy, but I
              could not take it.  When I am escorting nurses in the housing unit I
16            have to focus on their safety and the distribution of medication.  I
              cannot be distracted or collect papers from inmates.  I did not curse,
17            call plaintiff a "snitch," or tell other inmates that it was plaintiff's
              fault.  That is not in my personality or demeanor.
18

19   (ECF No. 73-7 at 3.)  Defendants did not provide a declaration from defendant Lopez.

20       In opposition, plaintiff points to the declarations of inmates Reeda and Nicholson.[19]  (ECF

21   No. 17-5 at 19, 21-22.)  Plaintiff claims that Colter and Lopez left their posts without permission,

22   and came to the housing unit on March 24, 2011, "under the pretense of assisting the nurse

23   passing out medication to inmates."  (ECF No. 82 at 28.)  Plaintiff argues that Lopez' refusal to

24   accept the memo from plaintiff does not advance a legitimate goal.  (ECF No. 82 at 29.)

25       As set forth above, plaintiff must show:  (1) that a state actor took some adverse action

26   against him (2) because of (3) the prisoner's protected conduct, and that such action (4) chilled

27   _____

28   [19]  Plaintiff also provided form declarations for inmates Woods and Finley, but the declarations
     are not signed.  (ECF No. 17-5 at 18, 20.)

1    the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably

2    advance a legitimate correctional goal.  Brodheim, 584 F.3d at 1269.  In Rhodes, the Ninth

3    Circuit cited a list of cases involving incidents that did rise to the level of retaliation:

> Gomez v. Vernon, 255 F.3d 1118, 1127 (9th Cir. 2001) (holding
> that "repeated threats of transfer because of [the plaintiff's]
> complaints about the administration of the [prison] library" were
> sufficient to ground a retaliation claim); Hines, 108 F.3d at 269
> (holding that the retaliatory imposition of a ten-day period of
> confinement and loss of television -- justified by a correctional
> officer's false allegation that the plaintiff breached prison
> regulations-violated the First Amendment); Pratt, 65 F.3d at 807
> ("[I]t would be illegal for [corrections] officials to transfer and
> double-cell [plaintiff] solely in retaliation for his exercise of
> protected First Amendment rights."); Valandingham v. Bojorquez,
> 866 F.2d 1135, 1138 (9th Cir. 1989) (holding that, if correctional
> officers indeed called plaintiff a "snitch" in front of other prisoners
> in retaliation for his filing grievances, it would violate the First
> Amendment).

13   Rhodes, 408 F.3d at 568.  In claims brought by inmates alleging retaliation, the plaintiff "bears

14   the burden of pleading and proving the absence of legitimate correctional goals for the conduct of

15   which he complains."  Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995).

16          Here, on both occasions, defendant Lopez was involved in the distribution of medication,

17   a legitimate correctional concern.  Even assuming that on March 24, 2011, defendant Lopez told

18   the inmates that plaintiff was responsible for the change in how the medication was distributed,

19   plaintiff fails to demonstrate how such statement was made in retaliation for plaintiff's protected

20   conduct.[20]  A retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc*,

21   literally, "after this, therefore because of this."  Huskey v. City of San Jose, 204 F.3d 893, 899

22   (9th Cir. 2000).  The plaintiff must show causation or that the defendant was substantially

23   motivated by or because of plaintiff's protected conduct.  Plaintiff's unverified statement that he

24   had threatened to write up Lopez the day before, without more, fails to demonstrate such

---

[20]  Inmate Nicholson declares that after defendant Lopez made the "snitch ass" comment, both
Colter and Lopez said "fuck that memo and they didn't care what the Warden said."  (ECF No.
17-5 at 22.)  Nicholson then recalls that plaintiff told defendant Lopez that "he was writing her
up."  (Id.)  However, because this reference to an appeal occurred after the "snitch ass" comment
was made, it could not have been the motivating factor for Lopez' comment.

1     statement was the sole motivating factor for her actions the next day.

2          Similarly, as to the March 28, 2011 incident, plaintiff fails to show that defendant Lopez'

3     comment was made in retaliation for plaintiff's protected conduct.  Plaintiff's retaliation claim is

4     based solely on the statements allegedly made by Lopez to plaintiff on March 28, 2011.

5     However, such statements, standing alone, do not establish that plaintiff's appeals were the

6     substantial or motivating factor for defendant Lopez' alleged retaliatory acts.  See Mt. Healthy

7     City Board of Ed., 429 U.S. at 285-86.  Plaintiff adduced no other evidence demonstrating that

8     her comments were motivated by plaintiff filing administrative appeals or threatening to file an

9     appeal.  Even assuming that defendant Lopez made such statements, the timing of Lopez'

10    statements on March 28, 2011, standing alone, do not suggest that they were motivated by

11    plaintiff's protected conduct.  Accordingly, defendant Lopez is entitled to summary judgment.

12                    G.  Fourteenth Claim (Colter)

13         Plaintiff alleges that on March 23, 2011, defendant Colter called him a snitch around other

14    inmates because plaintiff was exercising his First Amendment rights which chilled his First

15    Amendment rights.[21]  (ECF No. 17 at 39.)  Specifically, plaintiff alleges that he:

16              was escorted to the medical by defendant A. Lopez regarding an
              inmate appeal and examination[.] [W]hen plaintiff got to the
17              pedestrian sallyport gate defendant E. Colter told plaintiff to go
              back out[.] [D]efendant A. Lopez stated to defendant E. Colter that
18              she was escorting plaintiff to the medical[.] [D]efendant E. Colter
              said I do not give a damn. [T]hen stated to plaintiff you go your
19              snitch ass back out the gate. [D]efendant A. Lopez asked defendant
              E. Colter what did you say[?] [D]efendant E. Colter stated this
20              snitch ass motherfucker is going back out the gate stating he wants
              to file appeals against me. At the time it was a group of inmates
21              who stopped talking and start looking at plaintiff. [D]efendants A.
              Lopez and E. Colter left plaintiff at the gate and went into the
22              medical[.] [A]fter 10 minutes defendant E. Colter came back to get
              plaintiff and stated bring your snitch ass on[.] . . .
23

24    (ECF No. 17 at 37-38.)

25    _____
      [21]  In his pleading, plaintiff also alleged that defendant Colter retaliated against plaintiff on
26    February 28, 2011, by listening in during the medical exam, and included his claim against Lopez
      based on the events of March 28, 2011.  (ECF No. 17 at 39-40.)  However, in the screening order,
27    the court did not find that plaintiff stated cognizable claims against Colter concerning such
      incidents.  (ECF No. 19 at 10.)
28
                                        40

1    Defendants argue that defendant Colter is entitled to summary judgment because

2    defendant Colter declares he did not call plaintiff a "snitch" or curse at him, but only made

3    plaintiff wait ten minutes at the sallyport gate for security reasons.  (ECF No. 73-7 at 2.)

4    Defendant Colter declares that plaintiff was very upset and did not want to wait.  (Id.)

5    Defendants contend that making plaintiff wait ten minutes is not an adverse action, and plaintiff

6    failed to adduce evidence that such action was retaliatory.  (ECF No. 73-1 at 24.)  Finally,

7    defendants argue that even assuming defendant Colter called plaintiff a name, it is not actionable

8    under § 1983, citing Keenan v. Hall, 83 F.3d 1083, 1091 (9th Cir. 1996).  (ECF No. 73-1 at 24)

9    In opposition, plaintiff provides the declarations of inmate Childs, Millsap, and Ward who

10   confirm plaintiff's description of what took place on March 23, 2011, at the sallyport.  (ECF No.

11   17-5 at 15-17.)  In addition, inmate Ward also declares that after the exchange between plaintiff

12   and Colter, Ward and his friends were arguing over whether plaintiff was snitching on inmates or

13   other correctional officers, "but that if [plaintiff] was snitching on inmates we were going to put

14   the word out and get him."  (ECF No. 82 at 159.)[22]  After plaintiff went into the medical door,

15   Ward declares that he called defendant Colter over and asked him whether plaintiff was a snitch.

16   (Id.)  Ward declares that defendant Colter stated, "yeah Florence being snitching on inmates and

17   C/O's and that Florence just wrote a 602 on him snitching."  (Id.)  Ward declares that he "wanted

18   to beat the shit out of Florence."  (ECF No. 82 at 160.)  The next day, Ward declares that he and

19   his friends were all "about to beat Florence up," but one of his friends saw plaintiff and said "he

20   wasn't a snitch and that Florence be fighting for his rights and be filing 602s trying to get the

21   things that he is entitled to and the C/O's hate Florence for it."  (ECF No. 82 at 160.)  Ward and

22   one of his friends then approached plaintiff and told him what defendant Colter had said, and how

23   Ward's friend had clarified that plaintiff was not a snitch and that Colter had lied, and plaintiff

24   asked Ward to get affidavits stating what defendant Colter said.  (ECF No. 82 at 160.)  Inmate

25   Ward declares that at the time Colter called plaintiff a snitch, Facility B-yard at CSP-SAC "was

26

27   [22]  This declaration was signed by inmate Ward on October 26, 2014.  (ECF No. 82 at 160 (¶¶ 1-
     14.)  Plaintiff previously provided a declaration by inmate Ward, dated May 3, 2011.  (ECF No.
28   17-5 at 16 (¶¶ 1-8.).)

1  one of the most violent yards in the state of California and inmates on the yard would beat up or

2  stab[] other inmates on a regular basis, especially an inmate who snitch[ed] on another inmate."

3  (ECF No. 82 at 160.)

4          Defendants did not file a reply.

5          Plaintiff has adduced evidence supporting his claim that defendant Colter retaliated

6  against plaintiff on March 23, 2011.  The adverse action taken against plaintiff was calling him a

7  snitch due to plaintiff going to file appeals against Colter or filing 602 appeals, both protected

8  conduct under the First Amendment.  Defendant Colter calling plaintiff a snitch did not advance a

9  legitimate correctional goal, and allegedly chilled plaintiff's First Amendment rights, as well as

10 risked his safety, as supported by Ward's declaration.  While defendants are correct that verbal

11 harassment does not rise to the level of a constitutional violation, use of the term "snitch" in the

12 prison setting is inflammatory and may pose a danger to an inmate's safety, distinguishing it from

13 vulgarity or other offensive terms that constitute mere harassment.  Various conduct can be

14 actionable as retaliatory if undertaken for an improper purpose.  See, e.g., Rizzo v. Dawson, 778

15 F.2d 527, 531-32 (9th Cir. 1985).  Defendant Colter's motion for summary judgment on this

16 claim should be denied.

17 VIII.  Conclusion

18         In accordance with the above, IT IS HEREBY RECOMMENDED that:

19         1.  Defendants' motion for summary judgment (ECF No. 73) be denied as to plaintiff's

20 claim that defendant Colter retaliated against plaintiff on March 23, 2011, and granted in all other

21 respects; and

22         2.  This matter be returned to the undersigned for further scheduling.

23         These findings and recommendations are submitted to the United States District Judge

24 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

25 after being served with these findings and recommendations, any party may file written

26 objections with the court and serve a copy on all parties.  Such a document should be captioned

27 "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

28 objections shall be filed and served within fourteen days after service of the objections.  The

1  parties are advised that failure to file objections within the specified time may waive the right to

2  appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3  Dated:  March 9, 2016

4

5                                                    KENDALL J. NEWMAN
                                                     UNITED STATES MAGISTRATE JUDGE

6  /flor3119.msj

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28